FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2021 JUN 22 PM 4: 04

MARGARET BOTKINS, CLERK
CASPER

Stuart R. Day, WSB# 5-2244, sday@wpdn.net
Ryan J. Schwartz, WSB# 6-3611, rschwartz@wpdn.net
Ryan L. Ford, WSB# 7-4667, rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

Steven R. Popofsky, SPopofsky@kkwc.com
Pamela A. Frederick, PFrederick@kkwc.com
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)

*Admission pending*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| RIA R SQUARED, INC.,<br>a Delaware corporation,<br><br>    *Plaintiff*<br><br>v.<br><br>PAUL D. MCCOWN, and<br>MCCOWN ENTERPRISES, LLC,<br><br>    *Defendants* | )<br>)<br>)<br>)<br>)<br>)  Case No. 21 CV 125 - S<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND

## REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF

Plaintiff, Ria R Squared, Inc. ("R Squared"), by and through undersigned counsel, states

and alleges as follows for its *Complaint and Request for Immediate Injunctive Relief* against

Defendants in the above-captioned matter:

## **NATURE OF THE ACTION**

1.      This is the story of a complex, calculated, methodical and fraudulent scheme, orchestrated by an individual holding a trusted and respected position with the Wyoming Catholic College, to defraud R Squared out of the sum of $15 million.

2.      Mr. Paul D. McCown, both individually and as the Managing Member and/or sole interest holder of McCown Enterprises, LLC ("Enterprises"), intentionally and deliberately falsified financial documentation to present himself to R Squared as an accredited investor worth over $750 million dollars. Based upon those representations, including forged bank statements and impersonating a bank officer, R Squared lent $15 million to Enterprises.

3.      Mr. McCown, through his then-counsel, subsequently denied any knowledge of the loan or loan documents, notwithstanding that he executed same, had them notarized by an employee of his employer, Wyoming Catholic College, and immediately transferred most of the loan proceeds within hours or minutes of receiving them. The falsity, and the great lengths Mr. McCown took to exact his plan, became known only days after funding the loan. Regrettably, the vast majority of the funds have now been disseminated to various entities and individuals affiliated with Mr. McCown, including his family members and his employer. But almost a million dollars of the funds were not (as far as plaintiff knows) distributed by Mr. McCown, and of the funds distributed, the whereabouts of millions of dollars remain not fully known.

2

4.     R Squared seeks the Court's assistance to halt the dissipation of Mr. McCown's dwindling assets, including some of the fraudulently obtained funds, and to regain its loss and recover its damages.

## THE PARTIES

5.     Plaintiff, Ria R Squared, Inc., is a registered Delaware Corporation, in good standing, primarily conducting business out of New York City, New York.

6.     Defendant Paul D. McCown is a resident of Lander, Fremont County, Wyoming. Mr. McCown's last known address is 10 Red Rim Road; Lander, Fremont County, Wyoming.

7.     Defendant McCown Enterprises, LLC, is a registered Wyoming Limited Liability Company of which Mr. McCown is its sole member. According to the Wyoming Secretary of State's website, Enterprises' purported principal place of business is Mr. McCown's personal residence address of 10 Red Rim Road; Lander, Fremont County, Wyoming.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

9.     The amount in controversy in this matter exceeds the sum of $75,000.00.

10.     Jurisdiction is proper in this District as both Mr. McCown and Enterprises reside and do business here, and the Promissory Note between R Squared and Enterprises expressly provides R Squared may commence legal proceedings or otherwise sue in any court having jurisdiction.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because (i) Defendants reside in, or are deemed to be residents of, the District of Wyoming and (ii) a substantial part of the events or omissions giving rise to the claims occurred in this District. By way of example, and without limitation, Mr. McCown and Enterprises routinely conducted business and issued fraudulent documents and correspondence from their home and principal place of business. Said efforts involved, among other entities, the Wyoming Catholic College ("College"), Wyoming Community Bank ("WCB") and Ameri-Tech Equipment Company, all in Lander, Wyoming.

## BACKGROUND

## THE DEVELOPING RELATIONSHIP BETWEEN THE PARTIES

12.     R Squared is a global alternative asset manager that applies its experience and expertise across global markets to deliver superior returns and minimize risk. Mr. David Kang serves as the President and Chief Executive Officer. *Affidavit of David Kang*, **Exhibit A** (attached hereto and incorporated herein by reference), ¶¶ 1-2.

13.     In conducting its normal operations, an affiliate of R Squared (also operated by Mr. Kang) was introduced to Mr. McCown, in his capacity as the Chief Financial Officer of the College, by a fellow officer at the College named Jonathan Tonkowich, the school's Executive Vice President. At the time, Mr. McCown represented that he was acting in connection with obtaining advisory services related to the College's endowment fund, which he stated was about to receive substantial additional funds. *Id.*, at ¶ 6.

4

14.     In March of 2021, Mr. McCown tragically altered the scope of that relationship. During a phone call, Mr. McCown advised that he had amassed substantial personal wealth and was seeking investment advisory services on his own behalf. Seeking to serve a potential client, and possibly nurture other investment possibilities, Mr. Kang put into motion the standard verification procedures, including obtaining a variety of personal and financial information from Mr. McCown. *Id.*, at ¶ 7.

15.     As the relationship continued to develop, Mr. McCown provided three (3) months of bank statements purportedly from his personal bank account at WCB (with an account number ending in 3668). Those statements revealed relatively small balances in January and February; however, March's statement reflected an immense deposit, and a final balance of $750,323,282. *Id.*, at ¶ 8. See also accompanying exhibits in the *Affidavit of David Kang.*

16.     Mr. McCown further supported his purported astounding wealth by providing US Bank statements, which appeared to confirm the large transfer described above. These statements revealed monthly balances of $753,827,565.56 in January, $825,378,726.44 in February and – after the purported $750 million transfer from US Bank to WCB on March 1, 2021 - $146,928,364.32 in March. *Id.*, at ¶ 10. See also accompanying exhibits in the *Affidavit of David Kang.*

17.     Over the ensuing weeks, Mr. McCown, in his individual capacity, and Mr. Kang continued to develop and formalize the investment advisory relationship, entering into an investment advisor agreement between Mr. McCown and R Squared's affiliate. *Id.*, at ¶ 11.

18.     Pursuant to regulatory requirements, various steps were required to further the relationship, including, but not limited to, undertaking the Know-Your-Customer ("KYC") process and anti-money laundering ("AML") procedures, as well as obtaining various additional documents from Mr. McCown and his bank. *Id.*, at ¶ 12.

19.     To facilitate the interaction with WCB, Mr. McCown instructed that all inquiries be addressed to his bank officer Mr. Kendall Hayford, stating "I don't have his email address, but his phone is (307) 310-5096." *Id.*

20.     Later that month, Mr. Kang was contacted by "Kendall Hayford" via e-mail correspondence emanating from the e-mail address of khayford@wyocommunityb.com, and containing a signature block bearing that same phone number of (307) 310-5096. That correspondence stated "Please advise the information you need and a time to discuss if necessary." Subsequently, Brian Kim, a colleague of Mr. Kang's, held a phone conversation with "Kendall Hayford" on May 5, 2021. *Id.* With that purported confirmation, the relationship with Mr. McCown appeared to be on track and moving in a positive direction.

## MCCOWN'S REQUEST FOR A $15 MILLION LOAN

21.     On May 5, 2021, Mr. McCown texted Mr. Kang that his business had a $26 million invoice outstanding to a supplier and that his business account (holding approximately $16 million) did not have sufficient funds to cover the debt. Thus, Mr. McCown inquired if Mr. Kang's business would float the difference and lend $10 million on a short term loan. *Id.*, at ¶ 15.

22.     The loan was stated to be sought in lieu of moving funds from Mr. McCown's personal account, which did not come as a surprise to R Squared. In the accredited investor world, movement of funds into or out of a personal account, in the days preceding an imminent transfer of substantial personal wealth to a custodial account, may result in delays associated with AML requirements. *Id.*, at ¶ 16.

23.     As Mr. McCown's request was not unusual, discussions ensued regarding documenting the loan. Once it became apparent that the loan would be provided by R Squared, Mr. McCown boldly increased his request from $10 million to $15 million, supposedly so that he would not be required to entirely deplete his business's account. *Id.*

24.     To process the loan, Mr. McCown e-mailed "Kendall Hayford" and R Squared, instructing that WCB was to release all personal account information required. "Mr. Hayford" replied, stating "Let me know what information you will require." *Id.*, at ¶ 17.

25.     In the ensuing days, R Squared was provided, purportedly from "Mr. Hayford" and copied to and on behalf of Mr. McCown, with the following:

> a.     A Deposit Account Control Agreement, purportedly executed by WCB, granting R Squared operational control over Mr. McCown's personal bank account, to act as security for the loan;
>
> b.     An "attestation" form from WCB, on WCB letterhead and purportedly executed by WCB, verifying the account balance in Mr. McCown's personal account, on May 7, 2021, of $761,481,265.21;

      c.      An additional "attestation," to substantially the same effect as the prior correspondence, on May 11, 2021; and

      d.      Purported confirmation from "Mr. Hayford" that WCB would comply with R Squared's instructions and that WCB would provide prior written notification to R Squared regarding any withdrawal request from Mr. McCown's personal account.

*Id.*, at ¶ 18.

26.      With the typical requisite documents in order, on May 10, 2021, Mr. McCown, on behalf of Enterprises, executed a Promissory Note ("Note"), in favor of R Squared, in the amount of $15 million. He also personally executed a Security Agreement which granted R Squared a continuing security interest in his personal bank account. *Id.*, at ¶ 20.

27.      Where required, Mr. McCown's signature was notarized. Upon information and belief, the notary is an employee of the College. *Id.*, at ¶ 21.

28.      Prior to wiring the loan, Mr. Kim telephoned the bank and asked for Mr. Hayford. He was transferred through to Mr. Hayford's voicemail, thereby confirming that Kendall Hayford was in fact a bank officer at WCB. This confirmation gave R Squared additional comfort and security in issuing the loan. *Id.*, at ¶ 23.

29.      On May 11, 2021, R Squared wired the $15 million (less an origination fee) in accordance with wire instructions provided by Mr. McCown, the Note signed by Mr. McCown and duly notarized, and all of the supporting documentation referred to above. *Id.*, at ¶ 24.

## MCCOWN'S FRAUDULENT SCHEME COMES TO LIGHT

30.     In the days following his receipt of the $15 million loan, Mr. McCown continued to move forward with his stated intention to fund an investment advisory account with the massive amount of money purportedly held in his personal account at WCB. *Id.*, at ¶ 27.

31.     In the course of those dealings, "Kendall Hayford" supplied R Squared with a required anti-money laundering letter, purportedly on WCB letterhead and executed by "Kendall Hayford" as "VP Branch President." *Id.*, at ¶ 28.

32.     Notwithstanding various delays during mid-May – delays that Mr. McCown attributed to WCB's lack of sophistication and experience – on Friday, May 21, 2021 "Kendall Hayford" wrote to R Squared from the above-identified e-mail address, stating that "The funds have been released". A few hours later, Mr. "Hayford" confirmed "Details: amount: $761,000,000.00. Reference number is 0512B1OFD05D008127. BNP should see it come through shortly". And a few hours after that, Mr. "Hayford" sent a purported "Authorization for Wire Transfer" in the amount of $761,000,000" from the "Originator" Paul McCown to BNP Paribas, at the BNP account number Mr. Kang had provided, with the "ABA #, Swift Code, Sort Code" of "BNPAUS4NB25". *Id.*, at ¶ 29.

33.     However, the funds did not arrive that day, or on the following Monday the 24th (or ever). A series of excuses and evasions were put forth by Mr. "Hayford," but early in the week of May 24th, R Squared's then-counsel was able to be in touch with WCB's President and then with the bank's outside counsel. During those conversations, Mr. McCown's fraudulent activities began to become known. *Id.*, at ¶ 30.

34.     In connection with R Squared's investigation, an attorney then representing Mr. McCown stated that Mr. McCown denied signing the notarized loan documents; denied any knowledge of those documents; and denied borrowing money from R Squared at all.  Upon request, that lawyer memorialized those denials in writing on June 1, 2021. *Id.*, at ¶ 31.

35.     Upon further investigation, WCB has confirmed and sworn to the following information:

      a.     The WCB statements, with account number ending in 3668, as provided by Mr. McCown, are not true and correct, and appear to be forgeries;

      b.     The purported wire transfer into the account ending with 3668, on March 1, 2021, in the amount of $750,000,000.00, is fictitious and never occurred;

      c.     The attestations do not reflect the true and correct letterhead for WCB and the statements contained in the attestations are false, as they do not accurately reflect the bank's records;

      d.     Neither Mr. McCown, nor any entity he owns or controls, has ever held hundreds of millions of dollars in an account with WCB.

**Exhibit B** (attached hereto and incorporated herein by reference), *Affidavit of Scott Estep*, President of Wyoming Community Bank.

36.     Even more alarming, WCB provided the following additional sworn information:

a.   WCB never provided a Deposit Account Control Agreement in connection with Mr. McCown's bank account;

b.   The signature "Kendall Hayford" on all purported WCB documentation is not the actual signature of Mr. Hayford;

c.   The purported e-mail address of Mr. Hayford is a false e-mail address that has never been used by the real Mr. Hayford or the bank;

d.   The purported telephone number for Mr. Hayford is false, and Mr. Hayford has never used that number;

e.   Mr. Hayford had no knowledge of Mr. McCown, or his entities, entering into the loan agreement; and

f.   When Mr. Hayford inquired of Mr. McCown about the voicemail received from Mr. Kim as referred to above, Mr. McCown replied that he had "no idea" to what the message was referring.

**Exhibit C** (attached hereto and incorporated herein by reference), *Affidavit of Kendall Hayford*, Vice President, Branch Manager of Wyoming Community Bank.

37.   The affidavits as provided by WCB represent clear and convincing evidence that a complex, calculated, methodical and fraudulent scheme was orchestrated and executed by Mr. McCown against R Squared, utilizing false and forged documents purportedly from Mr. McCown's bank WCB and (presumably unwittingly) involving an employee of his employer, the College, as a notary.

11

## **WHEREABOUTS OF R SQUARED'S $15 MILLION**

38.     Upon further investigation, it appears that on May 11, 2021, within hours or minutes of receiving the loan proceeds from R Squared, Mr. McCown began transferring all of those millions of dollars out of his business's account at WCB (none of it to pay a purported "supplier"). Upon information and belief, he made the following transfers:

a.      He sent Phillip McCown, believed to be his father, $375,000.

b.      He sent his brother-in-law and sister-in-law, Paul and Claire Alarcon, $750,000.

c.      He transferred $550,000 to his personal WCB account, and that same day sent those funds from his personal account to a company named Trolan LLC, which is registered to conduct business in Wyoming but is located in Michigan (Mr. McCown's home state), and with which upon information and belief Mr. McCown is affiliated and may well own or control.

d.      He obtained, in person at WCB on May 11, a cashier's check payable to the State of Wyoming in the amount of $841,863.

e.      He sent $375,000 to an investment account in the name of Jonathan Tonkowich (Mr. McCown's colleague at the College who had introduced Mr. McCown to R Squared's principal) at the financial services firm Robert W. Baird and Company.   Later, he sent another $375,000 to

Robert W. Baird and Company, presumably to the same account of Mr.
Tonkowich.

f.       Most significantly, he transferred $10.5 million to an account in the name
of "The Paul and Jacinta McCown Fund" at "Goldman Sachs
Philanthropy Fund," which he then directed to transfer $10 million as
an "anonymous donation" to the College, where (as noted) he is the
Chief Financial Officer.

Exhibit A, at ¶ 25.

39.     The College recently confirmed, through counsel, that it has the $10 million
"anonymous gift" received from the Goldman Sachs Philanthropy Fund.  The College,
however, refused to accede to R Squared's request to provide R Squared with ten days notice
before transferring all or any part of those funds, and told R Squared that it is "inclined to
believe" Mr. McCown's denial of any fraud or wrongdoing, but did state that it has "voluntarily
and unilaterally decided to hold the funds pending completion of its investigation, or its
determination that [R Squared] does not intend to . . . provide [sufficient] support [for] its
allegations." *Id.*, at ¶ 32.

40.     Upon information and belief, Goldman Sachs has the $500,000 (difference
between the $10.5 million transferred to the Philanthropy Fund on May 11, 2021 and the $10
million transferred to College the next day). *Id.*, at ¶ 33.

41.     Paul and Claire Alarcon, Mr. McCown's brother-in-law and sister-in-law,
confirmed through their counsel that they have the $750,000 that Mr. McCown sent to them

on May 11, and they represented that they would provide R Squared with seven days notice before transferring those funds. *Id.*, at ¶ 34.

42.     Phillip McCown, believed to be defendant Mr. McCown's father, has not responded to counsel's inquiry and is presumed to be holding (or to have transferred or dissipated) the $375,000 believed to have been sent to him by his son on May 11. *Id.*, at ¶ 35.

43.     Trolan, LLC, has not responded to counsel's inquiry and is presumed to be holding (or to have transferred or dissipated) the $550,000 sent to it by Mr. McCown on May 19, 2021. *Id.*, at ¶ 36.

44.     Robert W. Baird and Company has acknowledged R Squared's inquiry, but without a subpoena or court order will not confirm receipt by Mr. McCown's fellow officer at Wyoming Catholic College, Jonathan Tonkowich, of the two $375,000 transfers from Mr. McCown or provide any information about subsequent transfers or where those funds may be at this time. *Id.*, at ¶ 37.

45.     R Squared has no further information regarding the funds issued to the State of Wyoming. *Id.*, at ¶ 38.

46.     The total of all known transfers of the $14.7 million wired to Enterprises, in furtherance of the $15 million loan, is $13,766,863. While there may have been additional subsequent transfers, almost a million dollars – $933,137 to be exact – remains unaccounted for. All or part of that sum may yet be in Enterprises' account at WCB and/or in Mr. McCown's personal account at that bank, or otherwise within Mr. McCown's custody and control one way or another. *Id.*, at ¶ 39.

## R SQUARED ACTIONS SINCE FUNDING THE LOAN

47.     Once it became apparent Mr. McCown had fraudulently induced the loan and had breached the Note, R Squared frantically sought to make contact with him to clarify the situation. Such attempts were either ignored or answered with vague and avoiding language.

48.     Consequently, on May 26, 2021, R Squared declared the Note in default and accelerated the amount due in accordance with its terms and conditions. *Id.*, at ¶ 22. R Squared has not received an acknowledgement of that correspondence from Mr. McCown.

49.     Given the extensive and complicated nature of this fraudulent and misleading activity, R Squared remains concerned that the funds whose whereabouts are not fully known – at least $3,450,000, or over $2,600,000 excluding the payment to Wyoming – may similarly and quickly be dissipated.  In addition, all of the disseminated funds may not remain stationary and be recoverable, particularly those that Mr. McCown distributed to himself and his company and his father. With each subsequent transfer, the efforts, costs and expenses necessary to find and halt the dissipation will be compounded.

50.     This matter has already significantly impacted the operations of 10, if not more, entities and individuals. It is crucial that Mr. McCown be immediately halted from engaging in further activities that will continue to dissipate his assets, including the money fraudulently obtained from R Squared.

51.     The actions of Defendants have significantly damaged R Squared, said damages to be proven at the trial of this action.

## CLAIM I

## IMMEDIATE

## PRELIMINARY INJUNCTION

52.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

53.     The fraudulent scheme set into play by Mr. McCown continues as of the filing of this pleading.

54.     Upon information and belief, Mr. McCown has no interest in resolving this matter outside of the involvement of the Court.

55.     Upon information and belief, and subject to further discovery, it is probable that Mr. McCown is continuing to dissipate his assets, including the proceeds of the $15 million loan.

56.     Given the elusive and creative nature of Mr. McCown to date, and his blatant and brazen disregard for the consequences of his misconduct, it is imperative that Mr. McCown and Enterprises be restrained from their ongoing fraudulent conduct, the continued dissipation of assets, including the funds fraudulently obtained, and the hindrance of justice.

57.     As a direct and proximate result of Mr. McCown's and Enterprises' actions, R Squared has been, and will continue to be, damaged.

58.     Given the circumstances as described herein, it is likely that should R Squared be awarded a judgment, Mr. McCown and Enterprises will not be able to satisfy that judgment – having dissipated their assets, including disseminating at least some of the proceeds of the

$15 million loan out of the reach of R Squared and perhaps out of the reach of the Court. In such event, R Squared will suffer irreparable injury, loss, harm and damage.

59.     The actions of Mr. McCown and Enterprises are not justified or privileged.

60.     The actions of Mr. McCown and Enterprises must be thwarted in order to avoid furtherance of the fraudulent scheme and to promote justice.

61.     The threatened, and continuing, injury to R Squared outweighs whatever damage (if any) Mr. McCown and Enterprises may face in this matter.

62.     An injunction would be in furtherance of the public interest, particularly as Mr. McCown and Enterprises have committed fraud against and involving financial institutions, including evidently impersonating a bank officer and forging bank documentation, while utilizing the assets and property (and an employee) of the College.

63.     An injunction, at this point, would preserve the *status quo* of the parties. While the funds would not be immediately returned to R Squared, Mr. McCown would not be able to further dissipate his assets, including the loan proceeds he fraudulently obtained from R Squared. In the event of the further litigation of this matter, given the strong evidence – including sworn testimony from the President and Vice President of Mr. McCown's bank – of Mr. McCown's and Enterprises' fraud and unequivocal and material breaches of the Note, there is a strong likelihood that R Squared will ultimately prevail on the merits of the case. Nonetheless, should R Squared not be successful in its claims, those holding the funds pending investigation and/or guidance or rulings from the Court would be able to retain them free and clear.

17

64.    This pleading and its related exhibits and filings contain sufficient verified facts and evidence to demonstrate immediate and irreparable loss, injury, loss or damage will result absent the requested relief. Given Mr. McCown's lack of responsiveness following the unraveling of his scheme, any further notice to him and to Enterprises would be a moot point.

65.    As set forth in R Squared's *Motion for Preliminary Injunction*, filed concurrently herewith and incorporated herein by reference, R Squared respectfully requests that the Court preliminarily enjoin Mr. McCown and Enterprises, pursuant to F.R.C.P. 65 and the Wyoming Fraudulent Transfer Act, from dissipating, disposing of, liquidating, disseminating and/or transferring, directly or indirectly, any of their personal assets or any assets of entities they own or control, other than in the ordinary course of business or personal affairs. R Squared further requests that under the circumstances, this order be granted without the requirement of posting a bond.

## CLAIM II

## **BREACH OF CONTRACT**

66.    R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

67.    Enterprises and R Squared expressly entered into the written Note.

68.    Sufficient consideration was exchanged as R Squared wired the loan proceeds based upon Enterprises' and Mr. McCown's promises to repay the loan.

69.    Under the terms and conditions of the Note, Enterprises expressly acknowledged as follows:

> Section 8. Events of Default. The occurrence of any of the following shall constitute an Event of Default hereunder:
>
> Section 8.2. Breach of Representations and Warranties. Any representation or warranty made or deemed made by the Borrower [Enterprises] to the Noteholder [R Squared] herein or in any certificate, document or report delivered in conjunction with the Loan is incorrect in any material respect or shall have been false or misleading in any material respect on the date as of which such representation or warranty was made or deemed made.

See Exhibit A, *Affidavit of David Kang*, Exhibit 18, pgs. 3-4.

70.     Based upon the factual allegations of the matter, it is now known that the banking statements and other information delivered by and purportedly on behalf of Enterprises and/or Mr. McCown were materially false and significantly altered to falsely bolster the financial condition of Enterprises and Mr. McCown. See Exhibits B-C.

71.     In addition, the Note expressly provided that Enterprises would not transfer monies from the bank account referenced in the Deposit Account Control Agreement without the prior written approval from R Squared. See Exhibit A, *Affidavit of David Kang*, Exhibit 18, pg. 4, § 7.1(c).

72.     Despite this express language, Mr. McCown and/or Enterprises transferred funds from the WCB accounts.

73.     The actions of Mr. McCown on behalf of Enterprises constitute a material breach of the express terms and conditions of the Note, and were willful and intentional.

74.     Upon recognition of the breach, on May 26, 2021, R Squared declared the Note in default and accelerated the amount due in accordance with its terms and conditions. Mr.

19

McCown and Enterprises were provided with the opportunity to cure the breach, but no cure has been provided as of the date of this pleading.

75.     Following the notice, the entirety of the Note was immediately due and payable. To date, Enterprises has failed to satisfy its obligations under the Note.

76.     Due to the breach, R Squared has suffered damages for which Enterprises is liable.

77.     Therefore, R Squared respectfully requests that the Court find in favor of R Squared on its breach of contract claim, order that Enterprises is required to repay the $15 million, plus pre-judgment interest at the rate of 5.5%, per the terms and conditions of the Note, that R Squared be entitled to post-judgment interest at the statutory rate of 10.0%, and for all fees, attorney fees, costs and expenses associated with the prosecution of this matter, as may be provided by law, and for any other damages under law or equity that may be proven at the trial of this matter.

## CLAIM III

## PIERCING THE CORPORATE VEIL

78.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

79.     The Wyoming Supreme Court has long recognized that piercing the corporate veil is an equitable doctrine. The determination of whether the doctrine applies centers on whether there is an element of injustice, fundamental unfairness, or inequity. This doctrine should be applied to the current matter.

80.     Mr. McCown is the sole member and manager of Enterprises.

81.     As evidenced in this pleading, Mr. McCown undertook methodical, ill-willed, deceitful and intentional methods to induce Mr. Kang into a relationship and then deprive his company R Squared out of $15 million.

82.     Upon obtaining the loan proceeds, Mr. McCown instructed that the same be disseminated for personal, rather than business-related, matters. Simply viewing the names and entities the funds were distributed to reveals the lack of corporate formality.

83.     Upon information and belief, Enterprises will not be able to satisfy any judgment awarded in this case due to the actions taken by Mr. McCown.

84.     Mr. McCown has failed to adequately capitalize the business, particularly in light of the large debts Enterprises was already facing, compounded by the large debt as issued by R Squared.

85.     Mr. McCown has caused Enterprises to disperse funds to its member, to his relatives and to other persons and entities, and has directly violated the terms of the Note, all to the detriment of R Squared, Enterprises' creditor.

86.     Upon information and belief, Mr. McCown utilized Enterprises to contract with R Squared with the intent to avoid performance and liability by use of the entity as a subterfuge for illegal and/or fraudulent transactions.

87.     It would be unjust and inequitable for the Court to allow Mr. McCown to hide behind the corporate veil of protection for the intentional and scheming actions that were taken.

88.     It would be unjust and inequitable for the Court to permit Mr. McCown to avoid personal liability on the Note for his actions in this case.

89.     Indeed, even the Operating Agreement of Enterprises suggests that Mr. McCown, its sole member, should be personally liable, as the agreement expressly states:

> **9.2 Indemnification by Company**. The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party.

See Exhibit A, *Affidavit of David Kang*, Exhibit 31, pg. 7.

90.     By the very operation of the entity itself, Mr. McCown is not entitled to liability protection from Enterprises and should be held personally liable for the essential theft of millions of dollars from R Squared.

91.     The Court should exercise this equitable doctrine and hold Mr. McCown personally liable for all damages awarded in connection with the Note – ensuring that any entity or asset he controls is subject to execution for repayment of the fraudulently obtained funds.

92.     Therefore, R Squared respectfully requests that the Court find in favor of R Squared and order that the corporate veil of Enterprises is hereby pierced, and Mr. McCown is personally liable for any judgment against Enterprises, including, but not limited to, the

requirement to repay the $15 million, plus pre-judgment interest at the rate of 5.5%, per the terms and conditions of the Note, plus post-judgment interest at the statutory rate of 10.0%, and for all fees, attorney fees, costs and expenses associated with the prosecution of this matter, as may be provided by law, and for any other damages under law or equity that may be proven at the trial of this matter.

## CLAIM IV

### FRAUD IN THE INDUCEMENT AND

### INTENTIONAL MISREPRESENTATION

93.      R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

94.      Mr. McCown and Enterprises intentionally and fraudulently induced R Squared into action, resulting in the loss of the proceeds of the $15 million loan.

95.      Mr. McCown's intentional, deceptive and fraudulent actions include, but are not limited to:

        a.      Falsifying material financial information on bank statements (which require altering multiple pages of information, not just one transaction), and providing the same to R Squared, in order to induce the belief that Mr. McCown and Enterprises were financially flush and that the assets in his personal account were sufficient to secure the $15 million loan many times over;

b.   Providing false contact information (both phone number and e-mail address) for an individual that he falsely represented was Mr. Kendall Hayford, Vice President of WCB;

c.   Creating a false, yet still functional, e-mail address purportedly on behalf of "Mr. Hayford";

d.   Impersonating a banking officer (in e-mails and phone calls) and forging signatures upon legally binding documents and agreements;

e.   Creating and producing falsified attestation statements (also with forged signatures), in order to induce the belief that Mr. McCown and Enterprises had more than sufficient assets at WCB to collateralize the $15 million loan; and

f.   Even going so far as to create fake confirmation numbers for the purported, but non-existent, conveyance of funds into the asset management account of R Squared's affiliate.

96.   Throughout the entirety of this process, Mr. McCown deflected the blame to others, with the intention of concealing the truth of the matter, including fostering the impression that Wyoming banks are unsophisticated and generally unfamiliar with funds transfers of the magnitude he was pretending to effectuate.

97.   Based upon the complexity and completeness of Mr. McCown's scheme, R Squared reasonably believed his representations were true and the documents he provided were legitimate.

98.     Reasonably relying on the information provided by Mr. McCown, including his false representations, R Squared acted upon the matter and has lost millions of dollars as a result.

99.     Indeed, the loan would not have been funded had the financial statements, banking confirmation and assistance and signatures not been presented during the due diligence of the transaction, as the loan was extended on the basis of the assets purportedly available to be seized by R Squared upon default through the Deposit Account Control Agreement and Security Agreement.

100.    Having 20-20 hindsight vision, it is now realized the represented funds were never held with WCB and likely never existed.

101.    The actions of Mr. McCown can only be described as intentional, with knowledge of the falsity.

102.    Therefore, R Squared respectfully requests that the Court find in favor of R Squared and issue an order and judgment that Mr. McCown and Enterprises fraudulently and intentionally induced R Squared into action and Mr. McCown and Enterprises is liable for the all damages incurred by R Squared, plus pre-judgment interest at the rate of 5.5%, per the terms and conditions of the Note, plus post-judgment interest at the statutory rate of 10.0%, and for all fees, attorney fees, costs and expenses associated with the prosecution of this matter, as may be provided by law, and for any other damages under law or equity that may be proven at the trial of this matter.

## CLAIM V

## NEGLIGENT MISREPRESENTATION – IN THE ALTERNATIVE

103.    R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

104.    In addition, R Squared hereby repeats, re-alleges and incorporates by reference the allegations of Claims IV.

105.    In the alternative to the claim for fraud in the inducement and intentional misrepresentation, R Squared asserts a claim for negligent misrepresentation.

106.    Under this claim, Mr. McCown and Enterprises supplied false information in the course of his business for the guidance of R Squared in its business.

107.    In doing so, Mr. McCown and Enterprises failed to exercise reasonable care in obtaining or relating the information.

108.    Due to their failures, R Squared suffered pecuniary loss, due to its justifiable reliance upon the provided information.

109.    Therefore, R Squared respectfully requests, should Claim IV fail, that the Court find in favor of R Squared and issue an order and judgment that Mr. McCown and Enterprises negligently induced R Squared into action and Mr. McCown and Enterprises is liable for all damages incurred by R Squared, plus pre-judgment interest at the rate of 5.5%, per the terms and conditions of the Note, plus post-judgment interest at the statutory rate of 10.0%, and for all fees, attorney fees, costs and expenses associated with the prosecution of this matter, as

may be provided by law, and for any other damages under law or equity that may be proven at the trial of this matter.

## CLAIM VI

### FRAUDULENT TRANSFER AND/OR CONVEYANCE

110.    R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

111.    Pursuant to Wyoming's Uniform Fraudulent Transfer Act (Wyo. Stat. § 34-14-201, *et. seq.*) (the "Act"), R Squared respectfully requests the Court declare the distribution and dissemination of the loan proceeds as a fraudulent transfer. The Act is designed to protect unsecured creditors from debtor transfers designed to frustrate debt-collection efforts.

112.    Upon discovery of the forged bank documents and instruments, R Squared essentially became an unsecured creditor of Enterprises, particularly as it had no control over the account the funds were wired to or Mr. McCown's personal accounts.

113.    Equally concerning is the continued dissemination of the loan proceeds to third parties. Pursuant to § 34-14-205, a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer: (i) with actual intent to hinder, delay or defraud any creditor, or (ii) without receiving a reasonably equivalent value in exchange for the transfer and the debtor was engaged in a transaction for which its remaining assets were unreasonably small in relation to the transaction or would incur debts beyond his ability to pay as they became due.

114.    As demonstrated earlier, Mr. McCown and Enterprises transferred the loan proceeds to recipients including Mr. McCown (individually), his immediate family, affiliated

and/or third-party business entities and his employer (through the Goldman Sachs Philanthropy Fund) – but not to the creditor. At no point in time did Mr. McCown advise R Squared of these transfers. Rather, he kept them concealed as best as he could after previously having deceived R Squared about his intentions regarding the use of proceeds.

115.    Upon information and belief, Mr. McCown received no value in exchange for these transfers. Indeed, the conveyance to the Philanthropy Fund was couched as an "anonymous gift" to be redirected, as $10 million of the $10.5 million conveyance was redirected, to Mr. McCown's employer, the College, of which Mr. McCown is Chief Financial Officer and presumably would have access to those funds.

116.    The transfers Mr. McCown made of the funds received from R Squared, immediately upon receipt of those funds, were of such a scope that it will not be possible to reimburse R Squared's losses and repay the loan from the account to which the funds were sent as directed by Mr. McCown.

117.    As the transfers began immediately after confirmation of the wire into the WCB account, the actions of Mr. McCown can only be described as occurring shortly after a substantial debt was incurred.

118.    Pursuant to § 34-14-208, R Squared may entitled to a preliminary injunction, pursuant to F.R.C.P. 65 and the Wyoming Fraudulent Transfer Act, restraining Mr. McCown and Enterprises from dissipating, disposing of, liquidating, disseminating and/or transferring, directly or indirectly, any of their personal assets or any assets of entities they own or control,

other than in the ordinary course of business or personal affairs.  R Squared further requests that under the circumstances, this order be granted without the requirement of posting a bond.

119.    Therefore, R Squared respectfully requests that the Court declare the transfers of the loan proceeds from WCB as a fraudulent transfer under the Act, and issue an injunction as set forth in paragraphs 65 and 118 above accordingly.

**CLAIM VII**

**<u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

120.    R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

121.    The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.

122.    In Wyoming, compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed upon common purpose and justified expectations of the other party.

123.    A breach of the covenant of good faith and fair dealing occurs when a party interferes with the other party's performance. In the absence of evidence of self-dealing or breach of community standards of decency, fairness or reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

124.    Here, the actions of Mr. McCown and Enterprises can only be described as adverse to the agreed upon common purpose and justified expectations of R Squared under the Note.

125.    Under the Note, R Squared lent the sum of $15 million in reliance upon the apparent security of McCown's financial strength, control over his WCB personal account purportedly containing over $750 million, and his promise to ultimately repay the proceeds.

126.    From the outset, Mr. McCown intentionally denied R Squared the right to receive performance under the terms and conditions of the Note.

127.    There is not merely absence of self-dealing or breach of community standards of decency, fairness or reasonableness here; rather, this entire transaction is riddled with instances of lying, misleading, forgeries and falsities, each of which were deliberately designed and calculated to deprive R Squared of its contractual rights to performance under the Note.

128.    The actions by Mr. McCown and Enterprises injured R Squared's right to receive the benefit of the Note and the $15 million loaned as consideration for entering into the same.

129.    Therefore, R Squared respectfully requests that the Court find in favor of R Squared and issue an order and judgment that Mr. McCown and Enterprises have breached the implied covenant of good faith and fair dealing, order that Mr. McCown and Enterprises are liable for the $15 million, plus pre-judgment interest at the rate of 5.5%, per the terms and conditions of the Note, plus post-judgment interest at the statutory rate of 10.0%, and for all fees, attorney fees, costs and expenses associated with the prosecution of this matter, as may

be provided by law, and for any other damages under law or equity that may be proven at the trial of this matter.

## CLAIM VIII

## <u>CLAIM FOR PUNITIVE DAMAGES</u>

130.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

131.     At the outset, R Squared recognizes and appreciates that, under Wyoming law, punitive damages are disfavored and are to be allowed with caution within narrow limits.

132.     As recognized in Wyoming, punitive damages are only appropriate for circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct.

133.     Due to the willful, wanton and intentional actions of Mr. McCown, discussed in detail above and in the accompanying exhibits, punitive damages are warranted in this matter.

134.     In addition to a sum sufficient to punish, reprimand and deter further actions of a similar nature, R Squared requests that any profits derived from the proceeds of the loan held by Mr. McCown or Enterprises (and their controlled affiliates) be disgorged to the favor of R Squared, so as to deprive Mr. McCown and Enterprises of any ill-received benefit.

135.     Finally, R Squared requests that it be awarded its attorney fees and costs in this matter, based upon the intentional and fraudulent actions of Mr. McCown.

31

136.    Thus, R Squared respectfully requests that the Court enter an exception to the "American rule" regarding recovery of attorney fees and costs, as Wyoming recognizes an exception to the general rule (denying recovery of attorney fees and costs) may be applied in the circumstances of fraud and the corollary award of punitive damages.

## CONCLUSION

It is certainly rare to see a fraud-based case of this magnitude and scope which is supported by early documentation and affidavits to this degree. The falsity, and the great lengths Mr. McCown took to exact his monumental plan are essentially unheard of in Wyoming. Regrettably, only through the involvement of the Court can implementation of Mr. McCown's fraudulent plan be halted before he further dissipates his assets, the funds touch more hands, and more parties need to be dragged into this litigation.

WHEREFORE, R Squared respectfully prays for immediate relief against Mr. McCown and Enterprises, as set forth in each respective claim and as may further the interests of equity and justice.

Due to the sensitivity and complexity of this fraudulent scheme, R Squared, via separate motion, may seek leave from the Court to perform expedited discovery (particularly in the form of serving subpoenas) to further assist it in ascertaining and securing the whereabouts of its funds and proving the scope and degree of the actions of Mr. McCown and Enterprises.

**RESPECTFULLY SUBMITTED** this **22nd day of June, 2021.**

/s/ _____

Stuart R. Day, WSB# 5-2244

sday@wpdn.net
Ryan J. Schwartz, WSB# 6-3611
        rschwartz@wpdn.net
Ryan L. Ford, WSB# 7-4667
        rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

Steven R. Popofsky,
        SPopofsky@kkwc.com
Pamela A. Frederick,
        PFrederick@kkwc.com
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)

*Admission pending*