Stuart R. Day, WSB# 5-2244, sday@wpdn.net
Ryan J. Schwartz, WSB# 6-3611, rschwartz@wpdn.net
Ryan L. Ford, WSB# 7-4667, rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

Steven R. Popofsky, SPopofsky@kkwc.com
Pamela A. Frederick, PFrederick@kkwc.com
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)
 *Pro-hac vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| RIA R SQUARED, INC.,<br>a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  21-CV-125 |
| PAUL D. MCCOWN, AND<br>MCCOWN ENTERPRISES, LLC,<br>a Wyoming Limited Liability Company | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT - FRAUD

Plaintiff Ria R Squared, Inc. ("R Squared"), through its counsel of record, submits its

Memorandum in *Support of Motion for Partial Summary Judgment - Fraud* as follows:

## I.    NATURE OF THE MATTER

Mr. Paul D. McCown, both individually and as the Managing Member and/or sole interest holder of McCown Enterprises, LLC ("Enterprises"), intentionally and deliberately falsified financial documentation and information to present himself to R Squared as an accredited investor worth over $750 million dollars. Based upon those representations, including forged bank statements and impersonating a bank officer, R Squared sent $14.7 million to McCown's business in connection with a loan transaction. As a result, R Squared is entitled to an Order (i) (i) granting R Squared partial summary judgment on its claims for fraud in the inducement and intentional misrepresentation; (ii) finding defendants jointly and severally liable for the claims for fraud in the inducement and intentional misrepresentation; (iii) awarding R Squared $14.7 million in damages against defendants for the claims for fraud in the inducement and intentional misrepresentation; and (iv) reserving R Squared's right to seek punitive damages on its claims for fraud in the inducement and intentional misrepresentation at a later date.

## II.    UNDISPUTED FACTS

### Defendants Methodically Perpetrate the Fraud

Upon information and belief, early in 2021 Mr. McCown, the then-Chief Financial Officer ("CFO") of Wyoming Catholic College ("WCC"), told his employer that he had become extraordinarily wealthy and wished to make a substantial donation to WCC. See Affidavit of David Kang, **Exhibit A**, attached hereto and incorporated herein by reference, ¶ 1.

During an introduction to R Squared, Mr. McCown represented that he was seeking advisory services relating to WCC's endowment fund, which was about to receive a $10 million donation (from his own promised donation, although he did not explain that to R Squared at the time). *Id.*, ¶ 5.  Mr. McCown soon informed R Squared he had amassed substantial personal wealth and was seeking investment advisory services on his own behalf.  As such, R Squared began the "Know Your Customer" procedures and requested from Mr. McCown a variety of personal and financial information about himself and his business, defendant Enterprises. *Id.*, ¶ 6.

In late March 2021, Mr. McCown sent the most recent three months of bank statements from his bank account at Wyoming Community Bank ("WCB"), with an account number ending in 3668.  *Id.*, ¶ 7, Exhibits 1-3.  The final statement showed a purported balance of $750,323,282 – the final result of what was shown to have been a large transfer from US Bank in Minneapolis.  *Id.*, Exhibit 3.  Mr. McCown also sent the three most recent bank statements purporting to be from his US Bank account and supporting the transfer of funds to WCB.  *Id.*, ¶ 8, Exhibits 4-6.  Over the ensuing weeks, Mr. McCown and R Squared discussed the details of an investment advisory relationship whereby R Squared would set up, through the international bank BNP Paribas, a custodial account for Mr. McCown's substantial wealth, which would initially be invested in a fund with R Squared's affiliate. *Id.*, ¶ 9.

During this time, R Squared received various documents purportedly executed by WCB Vice President and Branch Manager Kendall Hayford, from the email address khayford@wyocommunityb.com.  Those documents, among others, were on WCB letterhead

and purported to verify the account balance in Mr. McCown's account. *Id.*, ¶ 10, Exhibits 7-9.  In the coming weeks, R Squared exchanged or was copied on several emails with Mr. McCown and "Mr. Hayford."  *Id.*, ¶ 11.

In May 2021, Mr. McCown requested that R Squared loan his entity, Enterprises, $15 million to pay a purported supplier in order to alleviate a temporary cash-flow issue.  In order to nurture the relationship with WCC and its then-CFO Mr. McCown, and based upon defendants' financial documentation, R Squared agreed to loan $15 million to Enterprises. *Id.*, ¶ 12.  On May 10, 2021, Mr. McCown executed, on behalf of Enterprises, a notarized Promissory Note in favor of R Squared for $15 million. *Id.*, ¶ 13, Exhibit 10.  He also executed a notarized Security Agreement in his individual capacity.  *Id.*, Exhibit 11.

The activities, as recounted above, had one end-goal in mind – to manage the sizeable wealth Mr. McCown had amassed.  *Id.*, ¶ 14.

### Defendants Complete the Fraud

On May 11, 2021, R Squared wired a total of $14.7 million (the $15 million loan amount less an origination fee), in reliance on Mr. McCown's fraudulent representations, to Enterprises' account at WCB in accordance with the wire instructions provided by Mr. McCown. *Id.*, ¶ 15.  Once received, defendants quickly began transferring almost all of those millions of dollars out of Enterprises' account at WCB – none of it to pay a purported "supplier" or to pay any other actual expenses of the business. *Id.*, ¶ 16.  Instead, Mr. McCown made the following transfers:

12159235.6

a.      On May 11, Mr. McCown caused his business to wire $10.5 million to the "Goldman Sachs Philanthropy Fund," which Mr. McCown then directed to wire $10 million as an "anonymous donation" to WCC, where (as noted) he was at that time the CFO;

b.      On May 11, Mr. McCown caused his business to wire $375,000 to his brother, Phillip McCown;

c.      On May 11, Mr. McCown caused his business to wire $750,000 to his brother-in-law and sister-in-law, Paul and Claire Alarcon;

d.      On May 11, Mr. McCown caused his business to wire $375,000 to his close friend and colleague at WCC, Mr. Tonkowich, who had introduced him to R Squared's principal in the first place;

e.      On May 11, Mr. McCown caused his business to send $841,863 to the Wyoming Business Council in the form of a cashier's check;

f.      On May 19, Mr. McCown caused his business to wire $375,000 to Susan Gleason, an Admissions Counselor at WCC and employee of Mr. McCown's gin distillery, Sweetwater Spirits;

g.      On May 19, Mr. McCown caused his business to wire $550,000 to his personal WCB account, and that same day he sent those funds from his personal account to a company named Trolan LLC, which is registered to conduct business in Wyoming but is located in

Michigan (Mr. McCown's home state), and with which R Squared believes Mr. McCown is affiliated and may well own or control;

        h.      On May 24, Mr. McCown caused his business to wire another $250,000 to the Trolan LLC account.

*Id.*

Shortly after funding the loan, R Squared learned that the bank statements provided by Mr. McCown, as well as attestations and a Deposit Account Control Agreement, all purportedly signed by Wyoming Community Bank Vice President Mr. Hayford, were forged, inaccurate and fraudulent. *Id.*, ¶ 17, Exhibits 12 and 13.  R Squared also learned that the email domain "wyocommunityb.com" is not a domain used by WCB, and is not, and never has been, the email address of WCB Vice President Kendall Hayford. WCB personnel provided affidavits establishing that everything was a forgery.  *Id.*  Regrettably, R Squared knew none of that at the time it was fostering the relationship with Mr. McCown.  *Id.*, ¶ 18.

In June 2021, WCC placed Mr. McCown on "indefinite administrative leave" and shortly thereafter Mr. McCown resigned from his position as CFO of WCC.  *Id.*, ¶ 20.

Since May of 2021, the FBI has been investigating Mr. McCown for (potentially among other things) the fraudulent scheme perpetrated against R Squared, and has seized a substantial amount of the funds that defendants fraudulently obtained and subsequently distributed.  *Id.*, ¶ 21.  Despite those seizures, there is no assurance that R Squared will ever recover those seized funds from the government.  *Id.*, ¶ 22.

After R Squared sued defendants in this matter, their counsel filed an answer invoking their Fifth Amendment privilege against self-incrimination in response to virtually every substantive allegation against them, including the ones summarized above. *Id.*, ¶ 19; Doc. 42.

Throughout the course of the relationship with Mr. McCown and his business entity, R Squared reasonably relied upon Mr. McCown's representations, as set forth above, and believed them to be true. *Id.*, ¶ 23. R Squared reasonably relied upon the documentation provided by Mr. McCown and Enterprises, including forged and false bank statements purportedly from WCB and US Bank, and documents presented with the purported letterhead of WCB and with the purported signature of WCB officer Kendall Hayford. *Id.* Based upon that reasonable reliance, R Squared entered into the loan transaction and wired the loan proceeds. *Id.* R Squared would not have done so in the absence of those intentional misrepresentations and forged and fraudulent documents. *Id.*

## III.    STANDARD OF REVIEW

In *Lennen v. City of Casper, Wyoming*, this Court dictated the standard of review regarding summary judgment as follows:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented. Testimony or other evidence grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment.
>
> In considering the motion, the Court views the record and all reasonable inferences that might be drawn from it in the light

> most favorable to the party opposing summary judgment. Generally, the moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law. If the moving party carries this initial burden, the nonmoving party may not rest on its pleadings, but must bring forward specific facts showing a genuine dispute for trial as to those dispositive matters for which it carries the burden of proof.

No. 19-CV-41-SWS, 2021 WL 2885788, at *1 (D. Wyo. June 15, 2021)(internal citations and quotations omitted).

> When determining if a genuine issue of material fact exists regarding a claim of fraud, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. In ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.

*Wittmer v. Am. Med.*, No. 11-CV-126-F, 2011 WL 13112085, at *7 (D. Wyo. 2011) (internal citations and quotations omitted).

## IV.   ARGUMENT

For the purposes of this limited motion and memorandum, Plaintiff's claim rests upon fraud in the inducement and intentional misrepresentation. The elements (detailed below) are nearly identical.

R Squared is keenly aware its fraud claims must be proven by clear and convincing evidence, as opposed to by a preponderance of the evidence for negligent misrepresentation claims. The granting of summary judgment on a fraud claim is not a novelty in the US District Court system. *See*, for example, *Coactiv Capital Partners, Inc., v. Hudson Converting, Inc.*, 2010 WL

4316751 (N.D. New York 2010)(granting summary judgment for plaintiff on fraud claim, with elements similar to those of Wyoming's).

As revealed by the record and pleadings of the parties, the legal standard is easily met here given the unabashed actions of defendants.

## A.    ADVERSE INFERENCES SHOULD BE DRAWN AGAINST DEFENDANTS.

Due to defendants' prior pleadings in this matter, specifically their invocation of the Fifth Amendment, defendants cannot provide evidence to counter Plaintiff's claim that it was the victim of a sophisticated fraud perpetrated by defendants. Invoking the Fifth Amendment in a civil matter is more than just a failure of production on defendants' part. The invocation of the Fifth Amendment actually adds to the weight of the evidence favoring Plaintiff's claim because the Court is permitted to draw an adverse inference in a civil case when defendants refuse to testify on self-incrimination grounds. *See Arango v. U.S. Dept. of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997).

The presence of Enterprises in the fraudulent scheme does not alter the inference. The adverse inference drawn against an individual is similarly applied against corporate defendants when the actors refused to talk about conduct they engaged in while in the scope of their employment by the respective defendant. *See RAD Serv., Inc., v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986)(holding that the district court did not err in instructing the jury that it could draw an adverse inference against an insurance company based on a managing employee's Fifth Amendment invocation).

The Court's primary concern in this situation must be whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth. *See Bernal v. All Am. Inv. Realty, Inc.*, 479 F.Supp. 2d 1291, 1337 (S.D.Fla. 2007). When reviewing the materials contained in the record, the Court can easily be satisfied that an adverse inference against both the individual and corporate defendant is warranted as trustworthy and justified under all the circumstances.  Nor could defendants refute the overwhelming evidence against them even if he had not invoked the Fifth Amendment to avoid admissions that would have been used against them criminally.

**B.    SUMMARY   JUDGMENT    FOR    INTENTIONAL    MISREPRESENTATION    IS WARRANTED.**

To prevail on a claim for intentional misrepresentation or fraud under Wyoming law, a plaintiff must show:

> (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages. In order to prove intentional misrepresentation, the plaintiff must show that the misrepresentation was made intentionally, with knowledge of its falsity, or that the maker of the misrepresentation was at least aware that he did not have a basis for making the statement.

*Mellon v. Int'l Grp. for Historic Aircraft Recovery*, 33 F. Supp. 3d 1277, 1286 (D. Wyo. 2014), aff'd, 612 F. App'x 936 (10th Cir. 2015)(internal quotations and citations omitted).

Here, Mr. McCown and Enterprises made intentional misrepresentations regarding their wealth, assets and financial needs.

Knowing they did not have sufficient assets to warrant R Squared's services, and with the intent to defraud R Squared, the defendants falsified bank records and submitted them to R Squared. However, the bank records "are not true and correct statements from WCB for the account ending in 3668…and [were] forgeries." Exhibit 12, ¶¶ 3-4. "The purported wire transfer into the account ending in 3368 on March 1, 2021, in the amount of $750,000,000.00…is fictitious and never occurred. That transfer is not reflected in any record of WCB." *Id.*, ¶ 5. To the knowledge of Mr. Estep, "neither Paul McCown nor any entity he owns or controls has ever held millions of dollars in an account or accounts at WCB as WCB would be unable to hold such large of deposits." *Id.*, ¶ 8

Baiting his stick with the mother of all carrots, Mr. McCown intended for R Squared to act swiftly in order to gain access to the management of his $750 million investment. R Squared reasonably believed the representations to be true.

When considering whether clear and convincing evidence has been presented, the Wyoming Supreme Court has recognized conduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden. *Rogers v. Wright*, 2016 WY 10, ¶ 13, 366 P.3d 1264, 1271 (Wyo. 2016).

R Squared's reasonable belief was bolstered by what appeared to be additional formal verifications from WCB. Exhibits 8 and 9. Those verifications, apparently coming from Mr. Hayford at WCB, represented that Mr. McCown held over $750 million in his personal account. But, these documents were also part of defendants' master illusion. As before, "The format of the letterhead on the Attestations does not reflect the true and correct letterhead

for WCB, and the representation set forth in the Attestations is false…and does not accurately reflect the bank's accounts. Exhibit 12, ¶ 7.

Due to the representations and apparent verifications, R Squared reasonably relied upon defendants' story and funded the transaction. Nearly instantly, R Squared lost the entire $14.7 million that it wired to Mr. McCown's business.

There is only one logical and clear conclusion – defendants planned this fraud from beginning to the end.  Each document was intended to validate Mr. McCown's story. Each line of communication was proposed personally by Mr. McCown (i.e., use this e-mail, use this phone number, see this confirmation).  Each communication bought him a little more time as he lulled R Squared into action (even getting them to increase the loan amount – See Doc. 1, *Complaint*, ¶ 21).

Conversely, WCB is on record asserting that (as defendants have not denied) the e-mails, phone numbers, financial information, letterhead and signatures are all forgeries or inaccurate.  Exhibit 13, ¶¶ 4, 6, 8, 11, 14.

Defendants controlled the entirety of the scheme. Docs. 1-2, pgs. 53 and 59 (directing all communications to "Mr. Hayford" at the provided number). Even if there were other parties at work, Mr. McCown was at the center. Now, due to defendants asserting their Fifth Amendment right to silence, the Court should squarely and accurately assess liability against defendants.

R Squared has presented the Court with clear and convincing evidence of the orchestrated scheme.  The fallout of this matter, and the cost and expense of its litigation,

12159235.6

should not be permitted to continue further. Summary judgment, as a matter of law, is warranted.

**C.    SUMMARY JUDGMENT FOR FRAUD IN THE INDUCEMENT IS WARRANTED.**

To prevail on a claim for fraud in the inducement, the plaintiff must properly allege (1) defendants made a false representation; (2) reliance; (3) the asserted false representation was made to induce action; and (4) its belief that the representations were true. *Albrecht v. Zwaanshoek Holding En Financiering, B.V.*, 762 P.2d 1174, 1187 (Wyo. 1988).

As above, the facts clearly speak for themselves. Please note, due to the similarities between fraud in the inducement and intentional misrepresentation, R Squared will quickly walk through the facts supporting this claim and primarily rely upon the arguments of the previous section.

Defendants falsely represented to R Squared that Mr. McCown had amassed significant wealth, indeed in excess of $750 million, and was seeking asset management services and that Enterprises needed short-term funding to alleviate an alleged business headache. Mr. McCown represented that he would invest his purported $750 million through R Squared's affiliate for the purpose of inducing R Squared to loan Enterprises the funds.  Defendants supported their positions with communications and instruments purportedly from WCB, and these documents were ultimately relied upon by R Squared.  Certainly, the chain of events was intended with only one goal on the part of Mr. McCown and Enterprises – to receive $14.7 million.

R Squared relied and acted upon those fraudulent representations. R Squared was entirely within reasonable realms once WCB appeared to verify the accuracy of Mr. McCown's and Enterprises' assertions. Now, the FBI has seized a sizeable portion of the funds and is investigating defendants in connection with potentially filing criminal charges.

Wyoming courts routinely conclude that if the facts are such that they are undisputed, and it is plain that reasonable persons can draw but one inference from them, then the trial court should grant a properly filed motion either for summary judgment or for directed verdict. *Jackson Hole Mountain Resort Corp. v. Rohrman*, 2006 WY 156, ¶ 15, 150 P.3d 167, 172 (Wyo. 2006). The same routine conclusion and inference should be drawn here: (i) Mr. McCown's and Enterprises' actions were fraudulent; (ii) defendants' actions were taken to induce action by R Squares; (iii) R Squared reasonably believed and relied upon the fraudulent activity; (iv) R Squared was induced into action; and (v) R Squared has suffered damages due to defendants' actions.  Summary judgment is warranted.

## V.   CONCLUSION

WHEREFORE, R Squared respectfully requests that this Court enter an Order:

(i) granting R Squared partial summary judgment on its claims for fraud in the inducement and intentional misrepresentation;

(ii) finding defendants jointly and severally liable for the claims for fraud in the inducement and intentional misrepresentation;

(iii) awarding R Squared $14.7 million in damages against defendants for the claims for fraud in the inducement and intentional misrepresentation; and

(iv) reserving R Squared's right to seek punitive damages on its claims for fraud in the inducement and intentional misrepresentation at a later date.

Respectfully submitted this 22nd day of December, 2021.

RIA R SQUARED, INC.,
a Delaware corporation,

*Plaintiff.*

By:_____/s/: Ryan L. Ford_____
Stuart R. Day, WSB# 5-2244
    sday@wpdn.net
Ryan J. Schwartz, WSB# 6-3611
    rschwartz@wpdn.net
Ryan L. Ford, WSB# 7-4667
    rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

Steven R. Popofsky,
    SPopofsky@kkwc.com
Pamela A. Frederick,
    PFrederick@kkwc.com
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)
*Pro-hac Vice*

CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing pleading was served upon counsel of record via the ECF/CM Filing System (or otherwise as indicated below).

Jason Tangeman                    [ X]  Electronic Delivery
Nicholas & Tangeman               ECF/CM
170 N. 5ᵗʰ Street                 [   ]  Fax
Laramie, WY 82073-0928            [   ]  Overnight Delivery
                                  [   ]  U.S. Mail
                                  [   ]  e-mail to:


                                  By:_____/s/: Ryan L. Ford_____

12159235.6