UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2022 MAR 17 AM 11:05

MARGARET BOTKINS, CLERK
CASPER

| | |
|---|---|
| RIA R SQUARED, INC., a Delaware corporation, ) ) ) *Plaintiff* ) ) v. ) ) PAUL D. MCCOWN, and ) MCCOWN ENTERPRISES, LLC, ) ) *Defendants* ) | Civil Action No. 21-CV-125-S |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment - Fraud (Doc. 60) and accompanying memorandum with exhibits (Doc. 61). Defendants filed an opposition thereto (Doc. 64), and Plaintiff replied (Doc. 66). Having considered the motion, reviewed the record, and being fully advised, the Court finds and concludes partial summary judgment is warranted in Plaintiff's favor.

### SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). Testimony or other

evidence "grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

The Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). Generally, the moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). If the moving party carries this initial burden, the nonmoving party may not rest on its pleadings but must bring forward specific facts showing a genuine dispute for trial. *Id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

## PRE-DISCOVERY REQUEST FOR SUMMARY JUDGMENT

In this case, Plaintiff filed its motion for partial summary judgment before the Court had held an initial pretrial conference and before any meaningful discovery had been exchanged between the parties. The "general rule is that summary judgment should not be entered where the nonmoving party has not had the opportunity to discover information that is essential to his opposition ...." *Adams v. C3 Pipeline Constr. Inc.*, 17 F.4th 40, 64–65 (10th Cir. 2021) (quoting *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 904 (10th Cir. 2016)). Nonetheless, it is the nonmoving party's burden to request denial or deferral under Fed. R. Civ. P. 56(d). *Id.*

> Under Rule 56(d), a party that cannot yet "present facts essential to justify its opposition" may ask the court to deny or defer ruling on a summary-judgment

> motion, to grant additional time for discovery, or to order other appropriate relief. Fed. R. Civ. P. 56(d). But "Rule 56(d) is not self-executing. A party must invoke it." *Jones v. Secord*, 684 F.3d 1, 6 (1st Cir. 2012). Although summary judgment "should be refused" under Rule 56(d) "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition," we have emphasized that "this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1376 (10th Cir. 1988) (brackets and internal quotation marks omitted). A nonmovant opposing a summary-judgment motion must either demonstrate a genuine dispute of material fact "in a timely fashion" "or explain why it cannot pursuant to Rule 56([d])." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). "Otherwise, the nonmovant acts, or fails to act, at its peril." *Id.*

*Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1264 (10th Cir. 2020).

Here, "Defendants concede that no affidavit or declaration as contemplated by FRCP 56(d) is attached to" their opposition. (Doc. 64 p. 5.) "If a party opposing summary judgment seeks further discovery but 'fails to take advantage of the shelter provided by [Rule 56(d)] by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate.'" *Bilder v. Mathers*, 756 F. App'x 802, 806 (10th Cir. 2018) (unpublished) (quoting *Price ex rel. Price v. Western Res., Inc.*, 232 F.3d 779, 783-84 (10th Cir. 2000)).

Additionally, Defendants reference the Court's earlier denial of a stay of proceedings, where "the Court left the door open regarding the possibility of revisiting the stay." (Doc. 64 p. 5.) Defendants have not, however, actually requested the Court to reconsider the denial of a stay. (See Doc. 64.) Thus, the Court will proceed to consider the merits of Plaintiff's request for summary judgment.

## FACTS

The Court sets forth the following facts in conformity with the summary-judgment standard, which requires the Court to construe all facts and reasonable inferences in the light

most favorable to Defendants as the nonmoving parties. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020).

Defendant Paul McCown was formerly the Chief Financial Officer (CFO) of the Wyoming Catholic College in Lander, Wyoming. (Second David Kang Aff. ¶ 3.[1]) In March 2021, he was introduced to David Kang, the President and Chief Executive Officer (CEO) of Plaintiff Ria R Squared concerning his work at Wyoming Catholic College. (*Id.* ¶¶ 1, 6.) Mr. McCown soon asserted to Kang that "he had amassed substantial personal wealth and was seeking investment advisory services" for his personal money. (*Id.* ¶ 6.) In the coming weeks, Mr. McCown and Kang engaged in discussions whereby Plaintiff would create a custodial account through an international bank, BNP Paribas, for Mr. McCown's purported personal wealth. (*Id.* ¶ 9.)

Mr. McCown sent his most recent three months of bank statements from his bank account at Wyoming Community Bank (WCB) in Lander to Kang as verification. (*Id.* ¶ 7.) These three bank statements suggested Mr. McCown had a balance exceeding $750 million in his WCB account, mostly coming from a $750 million wire transfer from a US Bank account on March 1, 2021. (*Id.*; Doc. 61-1 pp. 9-18.) However, as Plaintiff would later learn, the "WCB Statements are not true and correct statements from WCB for the account ending in 3668 in Mr. McCown's name and appear to be forgeries," and the $750 million wire transfer "is fictitious and never occurred." (Scott Estep Aff. ¶¶ 5-6.[2])

Mr. McCown also provided to Kang several statements from the US Bank account held

---

[1] Doc. 61-1 pp. 1-8, signed December 20, 2021.
[2] Doc. 61-1 pp. 79-80, signed June 10, 2021.

jointly by Defendants showing a balance of over $750 million, until most of it was allegedly wired to Mr. McCown's personal WCB account. (Second David Kang Aff. ¶ 8; Doc. 61-1 pp. 19-51.) He also submitted to Kang two purported letters from Kendall Hayford, Vice President and Branch Manager of WCB, verifying Mr. McCown's WCB account held over $760 million (after the alleged wire from US Bank). (Second David Kang Aff. ¶ 10; Doc. 61-1 p. 61.) Hayford now swears by affidavit that these letters (and other documents bearing his signature) are false, he did not sign them, and he never knew about them until they were subsequently submitted to him by others. (Kendall Hayford Aff. ¶¶ 3-6.[3])

During the continued discussions and negotiations between Mr. McCown and Kang, Mr. McCown requested that Plaintiff loan McCown Enterprises "$15 million to pay a purported supplier in order to alleviate a temporary cash-flow issue." (Second David Kang Aff. ¶ 12.) "In order to nurture the relationship with [Wyoming Catholic College] and its then-CFO Mr. McCown, and based upon the financial documentation supplied by defendants, R Squared agreed to loan $15 million to McCown Enterprises." (*Id.*) Kang also explained, "That Mr. McCown's business might desire a loan at that juncture, notwithstanding the sum of money we understood to be in his personal bank account, was not surprising because I had previously advised him that movement into or out of his personal account, in the days preceding the (supposedly) imminent transfer of his personal wealth to the custodial account at BNP Paribas in furtherance of the investment advisory relationship, should be avoided if possible, as such movement would cause further scrutiny and delay implementation of the

---

[3] Doc. 61-1 pp. 92-95, signed June 10, 2021.

contemplated investment fund." (First David Kang Aff. ¶ 16.[4])

Kang received emails purportedly from Kendall Hayford, was copied on several emails purportedly involving Kendall Hayford, and Kang's colleague had a phone conversation purportedly with a "Kendall Hayford." (First Kang Aff. ¶¶ 12, 14, 17; Second Kang Aff. ¶¶ 10-11; Doc. 1-2 pp. 57-61; Doc. 1-3 pp. 3-14, 23-30, 39-42, 53-54, 73-77.) Hayford now affirms the emails were not from him, he never saw them at the time, and the emails used an email address and telephone number he never used and WCB never used. (Kendall Hayford Aff. ¶¶ 7-12.)

On May 10, 2021, Mr. McCown executed a promissory note on behalf of McCown Enterprises in Plaintiff's favor for $15 million as well as a security agreement in his individual capacity to personally secure the loan with his personal WCB account. (Second David Kang Aff. ¶ 13; Doc. 61-1 pp. 64-77.) The next day, Plaintiff wired a total of $14.7 million ($15 million minus a loan origination fee) to McCown Enterprises. (Second David Kang Aff. ¶ 15.) That same day, Defendants transferred almost all of the money out of McCown Enterprise's business account to various entities, none of which were a purported supplier. (Id. ¶ 16.) Of note, Defendants wired $10.5 million to a "Goldman Sachs Philanthropy Fund," which Mr. McCown then directed to wire $10 million to Wyoming Catholic College as an "anonymous donation." (Id. ¶ 16(a).) Defendants also wired over $1.4 million dollars to Mr. McCown's friends and family members. (Id. ¶¶ 16(b)-(d).) And in later days, Defendants distributed more than another $2.0 million to other entities Mr. McCown controlled or owed

---

[4] Doc. 1-1, signed June 21, 2021. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

money to as well as at least one more friend. (*Id.* ¶¶ 16(e)-(h).)

Not long after funding the loan, but after Defendants had distributed most of the money out of McCown Enterprises' account, Plaintiff "learned that the bank statements provided by Mr. McCown, as well as the attestations and Deposit Account Control Agreement purportedly signed by Wyoming Community Bank Vice President Mr. Hayford, were all forged, inaccurate, and fraudulent." (Second David Kang Aff. ¶ 17.) "Further, R Squared learned that the email domain 'wyocommunityb.com' is not a domain used by WCB, and is not, and never has been, the email address of WCB Vice President Kendall Hayford." (*Id.*)

In June 2021, Plaintiff filed this lawsuit seeking to recover its losses. It asserted several causes of action against Defendants, but Plaintiff seeks summary judgment in this motion for $14.7 million on its "Claim IV - Fraud in the Inducement and Intentional Misrepresentation." (Doc. 61 p. 2.) It also requests the Defendants be held jointly and severally liable and it be allowed to seek punitive damages on Claim IV at a later time. (*Id.*) Defendants oppose the entry of partial summary judgment. (Doc. 64.)

## DISCUSSION

The Court applies Wyoming state law in this matter because "in a federal court diversity case, '[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the [forum] state.'" *McGehee v. Forest Oil Corp.*, 908 F.3d 619, 624 (10th Cir. 2018) (quoting *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). A claim for fraud in the inducement/intentional misrepresentation carries the following three elements: "1) the defendant made a false representation intending to induce action by the plaintiff; 2) the plaintiff reasonably believed the representation to be true; and 3) the plaintiff suffered

damages in relying on the false representation." *Elworthy v. First Tennessee Bank*, 391 P.3d 1113, 1124 (Wyo. 2017); *Universal Drilling Co., LLC v. R & R Rig Serv., LLC*, 271 P.3d 987, 994 (Wyo. 2012). Fraud is never presumed and must be proved by clear and convincing evidence. *Garrison v. CC Builders, Inc.*, 179 P.3d 867, 877 (Wyo. 2008). Clear and convincing evidence is that which "persuades the trier of fact that the truth of the contention is highly probable." *Id.*

Plaintiff has carried its initial summary-judgment burden of establishing the elements of fraud by clear and convincing evidence based on the affidavits and documents submitted into the record. First, Mr. McCown made false representations to Plaintiff/Kang when he claimed to possess great wealth, then submitted altered bank statements and forged attestations to reflect the lie. His intent to induce action by Plaintiff did not come into focus until he requested the short-term $15 million loan from Plaintiff to address "a temporary cash-flow issue." Plaintiff also reasonably believed Mr. McCown's representation of wealth (and thus security for the loan) based on the falsified bank statements, the forged documents from "Kendall Hayford," the emails and phone call Plaintiff exchanged with "Kendall Hayford," and Mr. McCown's reputable position as the CFO of Wyoming Catholic College. Finally, Plaintiff was damaged by wiring $14.7 million to Defendant McCown Enterprises' business account at WCB, which was almost immediately distributed by Defendants to Mr. McCown's family members, friends, business associates, and certain entities. The Federal Bureau of Investigation (FBI) has been investigating Mr. McCown's actions since May 2021 and has seized a substantial amount of the $14.7 million Defendants received from Plaintiff, but Plaintiff to date "has not recovered - from the federal government or anyone else - a single

penny of the $14.7 million." (Third David Kang Aff. ¶¶ 2-4.[5]) In sum, Plaintiff has established its contentions of fraud are highly probable. Therefore, based on the testimony by affidavit and documents submitted, Plaintiff has carried its burden of proving the elements of fraud in the inducement/intentional misrepresentation by clear and convincing evidence. With Plaintiff having carried its initial summary-judgment burden, it now falls to Defendants to rebut Plaintiff's prima facie case by identifying specific facts that create a genuine dispute for trial.

The argument proffered by Defendants in opposition fails to raise a genuine dispute of material fact for trial. Defendants have not offered any counter-affidavits or documentation to controvert Plaintiff's summary-judgment evidence. (*See* Doc. 64.) Defendants make four mostly legal-based arguments in opposition to summary judgment. First, they contend partial summary judgment is premature at this early stage of the case. (Doc. 64 pp. 4-5.) As noted above, though, Defendants have not requested an opportunity for discovery through Fed. R. Civ. P. 56(d) nor have they renewed their request for a stay of proceedings.

Second, Defendants say an adverse inference should not be imputed against them for asserting the privilege against self-incrimination in answer to Plaintiffs' complaint. (Doc. 64 p. 5.) While Plaintiff contends an adverse inference may be drawn against Defendants based on their invocation of the Fifth Amendment, Plaintiff also notes Defendants could not overcome summary judgment "even if [Defendants] had not invoked the Fifth Amendment to avoid admissions that would have been used against them criminally" (Doc. 61 p. 10), and "R Squared does not now need to rely on the adverse inference" (Doc. 66 p. 3). Based on

---

[5] Doc. 66-1, signed January 27, 2022.

these assertions, the Court has not considered any adverse inferences based on Defendants Fifth Amendment invocations as part of this summary-judgment analysis, and the Court already determined Plaintiff has carried its initial burden of establishing its prima facie case without the use of any adverse inference. Thus, Defendants' argument against any adverse inference does not create a genuine dispute of material fact.

Third, Defendants contend Plaintiff has not shown any basis to hold both Defendants jointly and severally liable for any judgment entered in this lawsuit. (Doc. 64 pp. 5-6.) Plaintiff did not respond to this argument or provide any reasoning supporting its request for joint-and-several liability. (*See* Docs. 61, 66.) The alternative to joint-and-several liability is comparative fault under Wyo. Stat. § 1-1-109. It appears the Wyoming Supreme Court has never been confronted with the question of whether comparative fault is available on a claim of fraud in the inducement/intentional misrepresentation, which is an intentional tort. Therefore, this Court must predict the Wyoming Supreme Court's likely decision on the issue. *See Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005) ("Because Wyoming has not directly addressed this issue, this court must make an *Erie*-guess as to how the Wyoming Supreme Court would rule."). For two reasons, the Court anticipates the Wyoming Supreme Court would not apply the principles of comparative fault to a claim of intentional misrepresentation.

The first reason is that the plain language of Wyo. Stat. § 1-1-109 suggests it should not apply to intentional torts. Relevant to this case, the statute defines "fault" to include "acts … determined to be a proximate cause of … injury to person or property … that are in any measure negligent, or that subject an actor to strict tort or strict products liability …." Wyo.

Stat. Ann. § 1-1-109(a)(iv) (2021). The elements of intentional misrepresentation do not involve any measure of negligence, and the tort does not subject the actor to strict liability. Consequently, the Court concludes Wyoming's comparative fault statute by its own terms does not apply to a claim of intentional misrepresentation.

The second reason is that persuasive caselaw supports the non-application of comparative fault to a claim of intentional fraud. Starting in Wyoming with the case of *Erdelyi v. Lott*, 326 P.3d 165 (Wyo. 2014), the Wyoming Supreme Court determined § 1-1-109 does not allow the factfinder to "compare a claimant's negligence or comparative fault with the willful act of the perpetrator in a fraud case. *Id.* at 177. Similarly, in the recent case of *Cave v. State*, 2022 WY 30, --- P.3d --- (Wyo. Mar. 1, 2022), the Wyoming Supreme Court applied *Erdelyi's* reasoning to the intentional tort of assault and battery in concluding "it would be against public policy to allow an intentional tortfeasor like Mr. Cave to 'escape liability for his wrongful conduct by shifting the responsibility to [his] victim.'" *Id.*, ¶ 22 (alterations in original) (quoting *Erdleyi*, 326 P.3d at 177). These Wyoming cases are not on all fours with the facts in this case where Defendants are suggesting their fault should be compared against each other's rather than against Plaintiff's, but they inform the Court that comparative fault is not automatically applied in claims of intentional tort. Indeed, *Cave* noted that "[o]ther jurisdictions have similarly refused to apply comparative fault principles when the tortfeasor has committed an intentional tort." *Id.*, ¶ 22 (collecting cases). Additional courts have concluded similarly. *See, e.g., York v. InTrust Bank, N.A.*, 962 P.2d 405, 431 (Kan. 1998) (determining the state law application of comparative fault and the related abolition of joint-and-several liability in Kansas did not alter the application of joint-and-several liability "for

defendants in intentional tort actions"); *Florenzano v. Olson*, 387 N.W.2d 168, 175 (Minn. 1986) ("Without question, principles of comparative negligence would not apply to an intentional tort; we have never so applied them."). The Court finds the reasoning of this caselaw convincing and believes the Wyoming Supreme Court would hold likewise, thus precluding apportionment of the intentional misrepresentation claim among Defendants. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–15 (2009) ("When two or more causes produce a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.'") (quoting Restatement (Second) of Torts § 433A, Comment I, at 440 (1963-64)).

Taking all these considerations into account, the Court concludes the comparative fault principles of Wyo. Stat. § 1-1-109 do not apply to the claim of intentional misrepresentation/fraud in the inducement in this case and, instead, Defendants should be held jointly and severally liable for any judgment on the claim.

Fourth and finally, Defendants argue "there is no competent evidence in the record of actual damages." (Doc. 64 p. 6.) Defendants admit, though, that $14.7 million was "actually transferred by wire" from Plaintiff to "Mr. McCown's Lander bank." (*Id.*) Additionally, Kang stated in his affidavit that Plaintiff "wired a total of $14.7 million (the $15 million loan amount less an origination fee), in reliance on Mr. McCown's fraudulent representations, to the McCown Enterprises' business account at WCB." (Second David Kang Aff. ¶ 15.) And Mr. McCown executed a promissory note for $15 million on behalf of Defendant McCown Enterprises in Plaintiff's favor. (Doc. 61-1 pp. 64-72.) Finally, Kang affirmed Plaintiff has yet to recover any of the $14.7 million wired to Defendants. (Third David Kang Aff. ¶ 4.) Despite

Defendants' claim to the contrary, there is no genuine dispute that Defendants' intentional misrepresentations damaged Plaintiff in an amount of at least $14.7 million, which is the amount of damages sought by Plaintiff in its motion for partial summary judgment.

## CONCLUSION AND ORDER

Plaintiff has established its claim of fraud in the inducement/intentional misrepresentation by clear and convincing evidence, and Defendants have not identified a genuine dispute of material fact precluding summary judgment. Plaintiff is entitled to an award of partial summary judgment on that claim in the amount of $14.7 million.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment - Fraud (Doc. 60) is **GRANTED**. Partial summary judgment is entered in Plaintiff's favor on its cause of action for fraud in the inducement/intentional misrepresentation (Claim IV) in the amount of $14.7 million ($14,700,000.00).

**IT IS FURTHER ORDERED** that Defendants are jointly and severally liable on Plaintiff's claim of fraud in the inducement/intentional misrepresentation (Claim IV).

**IT IS FURTHER ORDERED** that Plaintiff's right to seek punitive damages on its claim of fraud in the inducement/intentional misrepresentation (Claim IV) is reserved and may be pursued at a later time.

DATED: March 17th, 2022.

Scott W. Skavdahl
United States District Judge